IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| YMIR-JULE von KOENIGSBERG-TYRVALDSSEN,<br><br>     Plaintiff,<br><br>  vs.<br><br>TRISTAN KOHUT and LEROY KIRKEGARD,[1]<br><br>     Defendants. | CV 15-00025-H-DLC-JTJ<br><br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Pending is Defendants' Motion for Summary Judgment. (Doc. 29.) Although the motion was filed on behalf of Defendants Kohut, Kirkegard, Reich and Strutzl, Defendants Reich and Strutzl were dismissed by Order dated December 19, 2016. (Doc. 49.) Defendant Kohut, a physician at Montana State Prison (MSP) and Warden Kirkegard are the only remaining Defendants.

Plaintiff Ymir-Jule von Koenigsberg-Tyrvaldssen[2] claims Defendants were

_____

[1]The case style has been amended to reflect the dismissal of Defendants Reich and Strutzl. (Doc. 49.)

[2]Plaintiff is incarcerated under the name "Arthur Rochelle" and all of his prison and medical records from MSP are under the name "Arthur Rochelle." Plaintiff disputes that his name is or ever has been Rochelle. (Statement of Disputed Facts ("Doc. 38"), Doc. 38 at ¶ 5.) Nevertheless, for purposes of these Findings, the Court considered all records (both prison records and medical records) produced by Defendants in the name of Arthur Rochelle.

1

deliberately indifferent to his serious medical needs while he as been incarcerated at Montana State Prison. Viewing the evidence and drawing all inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to identify a genuine issue of fact suggesting that Dr. Kohut or Warden Kirkegard were deliberately indifferent to his serious medical needs. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (the court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."). The motion for summary judgment should be granted.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do

not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts, in the form of affidavits or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. Yet, "[a] plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention "might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*,

810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

## II. ALLEGATIONS

Plaintiff alleges Dr. Kohut denied him medical care, sanitary supplies, and medications for his prostate cancer, bladder tumors, and Hepatitis-C. (Doc. 2 at 7.) He alleged Warden Kirkegard was made aware of the denial of medical care and acquiesced in those violations. (Doc. 2; Doc. 10.)

## III. UNDISPUTED FACTS[3]

Plaintiff has been incarcerated at Montana State Prison (MSP) since December 4, 2012. He was housed in the Martz Diagnostic Intake Unit (MDIU) between December 4, 2012, and January 24, 2013, was moved to High Side Unit 1 (HSU1) on January 24, 2013, to High Side Unit 2 (HSU2) on February 5, 2013, and to Unit D on September 19, 2013 where he is presently housed. (Doc. 30 at ¶¶ 6-8.) Plaintiff argues he should have never been housed on the high side of the prison (Doc. 38 at ¶ 8), but where Plaintiff was housed is not relevant to the issues

---

[3]The Court has construed "Plaintiff's Continued [sic] Refute of Both , , Facts and Affidavit of Defendant Kohut" (Doc. 38) as Plaintiff's Statement of Disputed Facts as required by Local Rule 56.1(b). Defendants' Statement of Undisputed Facts ("SUF") (Doc. 30) are deemed undisputed unless disputed in the Statement of Disputed Facts.

in this case.

When Plaintiff arrived at MSP, Dr. Kohut examined him and did an initial assessment. (Doc. 30 at ¶ 9.) During that initial assessment, Plaintiff claimed he suffered from prostate cancer, urinary incontinence due to bladder cancer, and low back pain caused by an accident in 1992. (Doc. 30 at ¶¶ 11-12; Doc. 38 at ¶ 12.) Plaintiff was using Canadian crutches when he was admitted. (Doc. 30 at ¶ 12.) Plaintiff also had high blood pressure (hypertension), a history of gastroesophageal reflux disease (GERD), Hepatitis-C, allergic rhinitis, and rectal issues. (Doc. 30 at ¶ 14.)

Plaintiff was and continues to be prescribed medications for high blood pressure and GERD, among other things. (Doc. 30 at ¶ 15.) Plaintiff contends he receives these prescriptions from providers other than Dr. Kohut. (Doc. 38 at ¶ 15.) At his initial assessment, Dr. Kohut referred Plaintiff for a lumbar spine x-ray and EKG. (Doc. 30 at ¶ 16.) Plaintiff contends the x-ray was done to justify taking away his crutches and was not done to help him. (Doc. 38 at ¶ 16.) Plaintiff received both the lumbar spine x-ray and EKG and both were normal. (Doc. 30 at ¶ 17.) To the best of Dr. Kohut's recollection, Plaintiff also received the National Commission of Correctional Health Care (NCCHC) recommended laboratory studies. (Doc. 30 at ¶ 18.)

Defendants contend that since his initial assessment, Plaintiff frequently refused care at the prison, making it difficult for MSP medical staff to treat him. (Doc. 30 at ¶ 19.) Plaintiff denies he refused treatment from any provider other than Dr. Kohut. He contends he met every appointment with all other providers (except Dr. Kohut) with courtesy and professionalism. (Doc. 38 at ¶ 19.) In their reply brief, Defendants pointed to evidence indicating that Plaintiff refused treatments by providers other than Dr. Kohut over 30 times while at MSP. (Doc. 41 at 5-6.)

Based upon Dr. Kohut's January 15, 2013 review of Plaintiff's records from outside medical facilities, it appeared that Plaintiff was previously diagnosed with and treated for prostate cancer, High Blood Pressure, Previous Heart Disease and Mild Degenerative Disc Disease of the Lumbar Spine (Chronic Low Back Pain/Lumbago). (Doc. 30 at ¶¶ 22, 23.)

After Plaintiff's initial assessment, Dr. Kohut assigned Plaintiff to MSP's Chronic Care (CC) clinic which is a predefined medical continuity of care mechanism by the NCCHC, by which patients with the following conditions, Hypertension, Diabetes Mellitus, Hyperlipidemia, Seizure Disorders, Coronary Artery/Cardiac Disease, Thyroid Disorders and Pulmonary Disorders, receive monitoring and care. (Doc. 30 at ¶¶ 23-24.) Plaintiff was assigned to CC clinic

7

due to his history of Hypertension and Coronary Artery/Cardiac Disease. (Doc. 30 at ¶ 25.) Plaintiff contends he has not received continuing care and on May 22, 2016 he filed yet another grievance in an attempt to secure medical care. (Doc. 38 at ¶ 24.)

### A. Oncology Care

Plaintiff was diagnosed with a "High Grade Neoplasia and Basal Cell staining," which was consistent with prostrate cancer on December 9, 2011. (Doc. 30 at ¶ 29.) He underwent external beam radiation therapy for his prostate cancer September 10 – November 16, 2012, in Helena, Montana. (Doc. 30 at ¶ 30.) Treatment appeared to be successful as determined by a series of Prostate Specific Antigen (PSA) level tests which were either in the normal range or were undetectable. (Doc. 30 at ¶ 31.) Plaintiff's lab results on September 30, 2015, showed his PSA level to be < 0.1 indicating that his prostrate cancer he appears to be in remission. (Doc. 30 at ¶ 32.) The PSA, however, cannot guarantee that disease is not present. (Doc. 30 at ¶ 33.) Therefore, Plaintiff needs continued surveillance through diagnostic testing and physical examination to ensure that recurrence of the carcinoma does not occur. (Doc. 30 at ¶ 34.)

Plaintiff was therefore scheduled for 3-6 month PSA testing. (Doc. 30 at ¶ 35.) Dr. Kohut contends, however, that Plaintiff refused scheduled diagnostic lab

work and chronic care visits on more than 20 occasions. (Doc. 30 at ¶ 36.)

Plaintiff argues this testing did not occur but not because he refused treatment or

lab work. (Doc. 38 at ¶ 35, 36.) He states he has significant hearing loss and may

not have heard or understood the loud speaker used to call inmates to medical.

(Doc. 38 at ¶ 38.) According to Dr. Kohut, Plaintiff does not need further

treatment for his prostrate cancer but he does need continued monitoring which the

prison has attempted to do. (Doc. 30 at ¶ 39.)

    In his initial assessment, Plaintiff also claimed he had bladder cancer. (Doc.

30 at ¶ 40.) However, a bladder biopsy performed on Plaintiff on January 9, 2012,

showed chronic inflammation, but no malignancies. (Doc. 30 at ¶ 41.) Plaintiff

contends a urologist described the area biopsied on January 9, 2012, as tumors. He

contends this inflammation has continued for four years. He also alleges that Dr.

Pirianian ordered an ultrasound which was not performed. He argues the

inflammation has reduced his bladder capacity to the point that it requires as many

as six trips to the toilet per hour which interferes with his sleep. (Doc. 38 at ¶ 40.)

    A full-body bone scan on January 17, 2012, and a CT of the abdomen and

pelvis on October 16, 2012, showed degenerative disc disease of his lumbar spine

but no cancer. (Doc. 30 at ¶ 42.) Plaintiff argues, however, that one bone scan

does not preclude the possibility of other malignancies for which he has not been

tested.  (Doc. 38 at ¶ 42.)

## B.  Incontinence and Sanitary Supplies

Plaintiff claims he suffers from urinary incontinence due to bladder cancer and his cancer treatments for which he continually requested sanitary supplies including "Depends," a urinal, and a catheter bag through grievances and medical kites.  (Doc. 30 at ¶¶ 43, 44.)

Defendants contend sanitary supplies, urinals, and catheter bags can present a security risk at MSP, as inmates can, for example, use sanitary supplies like "Depends" to block windows and plug up toilets or throw bags or receptacles full of urine.  (Doc. 30 at ¶ 49.)  Inmates must be therefore given a medical order to possess these sanitary supplies.  (Doc. 30 at ¶ 50.)  Plaintiff disputes this statement. He contends there are many inmates with these supplies and Defendants made up this security rationale.  (Doc. 38 at ¶ 49.)

Dr. Kohut sits on the "Special Needs Committee" which is a committee of 12 people specifically intended to review and address requests for sanitary and other medical supplies like those from Plaintiff.  (Doc. 30 at ¶ 46.)  The Special Needs Committee reviewed Plaintiff's need for such sanitary supplies several times, between December 11, 2012, and January 26, 2016.  (Doc. 30 at ¶ 47.)  As part of that review, the Committee investigated whether Plaintiff requested

10

additional bed changes or clothing changes.  The Committee was unable to confirm that Plaintiff exhibited any of these common objective indicators of incontinence. (Doc. 30 at ¶ 48.)  Plaintiff states he handled his need for both clothing and bed-changes secretly because "soiling oneself" makes one a target for abuse by other inmates.  (Doc. 38 at ¶ 48.)  Because the Committee was unable to confirm Plaintiff's incontinence from objective sources, it found that diapers and a urinal were not appropriate.  (Doc. 30 at ¶ 52; Doc. 36 at 12.)  Plaintiff claims his incontinence could have been confirmed with medical records.  (Doc. 38 at ¶ 52.)

Plaintiff was given access to sanitary supplies, including Depends on occasion, some of which he refused.  (Doc. 30 at ¶ 53.)  One such example was reviewed during the January 26, 2016 Committee Meeting, when Plaintiff requested a urinal for a trip to Butte to see a urologist.  The Prison found Depends to be a preferable alternative to the urinal.  (Doc. 30 at ¶ 54.)  Plaintiff disputes that Depends were preferable because they leak forcing him to sit in his own waste for an unknown amount of time waiting for transport officers to alleviate the situation. (Doc. 38 at ¶ 54.)  Plaintiff was offered Depends as an alternative to a urinal but he refused.  Plaintiff's continual refusal to be seen or evaluated has also been a problem for the Committee in assessing his actual need for any of these supplies. (Doc. 30 at ¶ 55.)

While Plaintiff was housed in MDIU, HSU1 and HSU2 between December 4, 2012, and September 19, 2013, he had access to a toilet anytime he was in his cell because each cell has a toilet/sink combination. (Doc. 30 at ¶ 63.) He was moved to D Unit on September 19, 2013 where bathrooms are located on each end of the floor. (Doc. 30 at ¶ 64.) Inmates are to use the designated bathroom for their cell assignment, but if it's urgent they can use the other bathroom. (Doc. 30 at ¶ 65.) Plaintiff disputes this statement and states that he was recently threatened by a night shift officer for using a secondary toilet when his primary toilet was being cleaned. He also argues that this does not address the medical issue of having to use the toilet some 50 plus times a day. (Doc. 38 at ¶ 65.) Inmates are free to access the bathrooms anytime unless the unit is locked down for count, as an example, or during an emergency on the unit. (Doc. 30 at ¶ 66.)

If an inmate who is in the dining area needs to use the restroom, he is returned to his unit. If this solution is unsatisfactory, the officer may escort the inmate to use the staff restroom. (Doc. 30 at ¶ 69.) Plaintiff claims the only time he was allowed to utilize the toilet during a meal he had to do the "mince walk" back to his unit while in extreme pain and was delayed by officers controlling the doors. (Doc. 38 at ¶ 69.) Meals times are very structured and are consistently called the same time every day. Inmates are expected to go to the bathroom before

they leave the unit for meals.  (Doc. 30 at ¶ 70.)  Plaintiff contends that because of his bladder issues, "schedules" are meaningless.  (Doc. 38 at ¶ 70.)

While in the infirmary lobby, staff provide access to the bathrooms for inmates.  (Doc. 30 at ¶ 72.)  Plaintiff states this is true but only when he was able to get the officers' attention and only if the officers responded to him.  (Doc. 38 at ¶ 72.)  The bathrooms are locked for security reasons.  (Doc. 30 at ¶ 73.)  Dr. Kohut has no information that Plaintiff was ever deprived use of the bathroom or that his access to the bathroom was restricted in any way.  (Doc. 30 at ¶ 74.)  Dr. Kohut never denied or restricted his access to the bathroom.  (Doc. 30 at ¶ 75.)  Plaintiff disputes this statement.  (Doc. 38 at ¶ 75.)

## C.  Medications

Plaintiff's pre-MSP medical records noted complaints of severe pain secondary to his radiation treatments, which is not uncommon.  (Doc. 30 at ¶ 76.)  According to the records, before arriving at MSP Plaintiff was treated with high dose narcotic analgesics including methadone.  (Doc. 30 at ¶ 77.)  On February 15, 2012, Plaintiff was admitted to the hospital for treatment of a methadone overdose.  (Doc. 30 at ¶ 78.)  On November 29, 2012, just prior to Plaintiff's incarceration at MSP, Dr. Thomas Justin, a doctor with the Cancer Treatment Center at St. Peter's Hospital in Helena stated, "I do not feel comfortable prescribing any other pain

medications in the future and this was voiced to him as he has broken many pain contracts with a number of different doctors." (Doc. 32-2 at 148.) Plaintiff denies he had an overdose. He alleges he was suffering from sleep-deprivation and novovirus which was mistaken for an overdose. (Doc. 38 at ¶ 78.)

Plaintiff was given pain medication on his arrival to MSP, including Oxycodone and Oxycontin. (Doc. 30 at ¶ 80.) He was then weaned from narcotic pain medication over a period of time. (Doc. 30 at ¶ 81.) On December 9, 2012, Plaintiff was given a second dose of Oxycodone as well as Oxycontin 60 mg for three days. On December 11, 2012, his Oxycontin was dropped to 40 mg twice a day for three days. On December 14, 2012, it was dropped to 20 mg twice a day for seven days, and then to 10 mg twice a day for 30 days. (Doc. 30 at ¶¶ 82-85.) Plaintiff denies he received this medication and denies there was a weaning period. He alleges he was summarily removed from these medications and Dr. Kohut told him to suffer. (Doc. 38 at ¶¶ 81, 84.). Plaintiff was also given a 30-day prescription of Klonazepam, an anti-anxiety medication. (Doc. 30 at ¶ 85.) Plaintiff does not recall receiving this medication. (Doc. 38 at ¶ 85.)

Although Plaintiff complained of severe, debilitating pain, Dr. Kohut could not determine the source of this pain, because Plaintiff did not allow Dr. Kohut to examine the areas in question, e.g., genital, perineal and anus rectum. (Doc. 30 at ¶

14

86.)  Plaintiff contends Dr. Kohut had proven himself to be an abusive and threatening individual.  He argues Dr. Kohut did not behave as a qualified medical professional and his exams made Plaintiff feel uneasy and ill-at-ease when he demanded "non-standard actions."  (Doc. 38 at ¶ 86.)

There is no indication in Plaintiff's pre-MSP medical records to indicate a physical examination of these areas was performed to substantiate a source of this pain.  X-Rays, CT scans, bone scans did not show any metastatic disease.  (Doc. 30 at ¶ 87.)  Plaintiff contends he had been examined with regard to this issue but it was of an "unknown etiology."  (Doc. 38 at ¶ 87.)  In Dr. Kohut's professional opinion, Plaintiff's subjective complaints were not substantiated by any objective findings, and narcotic analgesic treatment was not medically indicated.  (Doc. 30 at ¶ 88.)  This opinion was further complicated by Plaintiff's continued refusal to be examined.  (Doc. 30 at ¶ 89.)  Plaintiff contends his refusal was done because he did not want to be abused by Dr. Kohut.  (Doc. 38 at ¶ 89.)

## IV.  DISCUSSION

In order to prove a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Thus, in order to prevail, Plaintiff

must show both that his medical needs were objectively serious, and that Defendants possessed a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Wood v. Housewright*, 900 F.2d 1332, 133741 (9th Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a very demanding standard for "deliberate indifference." Negligence is insufficient. *Farmer*, 511 U.S. at 835. Deliberate indifference is established only

where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

The Court will assume for purposes of these Findings, that Plaintiff has a multitude of serious medical needs including recovery from prostate cancer, bladder issues, Hepatitis C, high blood pressure, and GERD. The record, however, does not support his claim that Dr. Kohut was deliberately indifferent to those needs. Plaintiff's claims fail primarily for one reason: The only medical provider named in this action is Dr. Kohut and Plaintiff admits he refused to be examined by or treated by Dr. Kohut. (Doc. 38 at ¶¶ 19, 26, 28, 36, 39, 89, 109, 117, 131.) In fact, Plaintiff states that "Defendant Kohut has had no (or should have had no)

input in any treatment." (Doc. 38 at 9, ¶ 16.) Because Plaintiff refused to be treated by Dr. Kohut, it is impossible to find that Dr. Kohut was deliberately indifferent to Plaintiff's medical needs.

Because of Plaintiff's multitude of medical issues, he presents what appears to be a difficult medical case to monitor and treat. The records presented by Defendants suggests that the medical staff at MSP attempted to treat and monitor Plaintiff's medical conditions. Although it may not be the care Plaintiff desires and it may not be given by the caregivers Plaintiff desires, there is no evidence that Dr. Kohut was deliberately indifferent to Plaintiff's serious medical needs.

### A. Prostrate Cancer

Dr. Kohut assigned Plaintiff to MSP Chronic Care clinic when Plaintiff was first incarcerated at MSP. It is undisputed that Plaintiff suffered from prostrate cancer prior to his arrival at MSP. But he completed his radiation therapy for that cancer prior to his December 4, 2012 arrival at MSP. (Doc. 30 at ¶ 30.) Dr. Kohut contends the only treatment Plaintiff needs at this time for his prostrate cancer is continued monitoring. Whether or not Plaintiff should have been given additional treatment upon his arrival at MSP is irrelevant at this point, because his lab results on September 30, 2015, showed his PSA level to be < 0.1 which according to Dr. Kohut indicates that Plaintiff is in remission. (Doc. 30 at ¶ 32.) Neither party

pointed to evidence indicating that Plaintiff continued to suffer from prostrate cancer after he entered MSP and Plaintiff does not dispute that his cancer is in remission.  (Doc. 30 at ¶ 32.)

It is undisputed that a PSA test alone cannot guarantee that disease is not present, but the record is clear that Plaintiff refused most of the diagnostic testing and physical examination necessary to monitor any recurrence of cancer.  (Doc. 30 at ¶ 34.)  It is also undisputed that Plaintiff was scheduled for 3-6 month PSA testing to ensure that recurrence of the cancer does not occur.  (Doc. 30 at ¶ 35.) Whether or not Plaintiff chose to take advantage of that monitoring cannot in anyway effect the liability of Dr. Kohut.  Because Plaintiff was scheduled for this testing to monitor his future risk of cancer, there is no issue of material fact that Dr. Kohut was not deliberately indifferent to Plaintiff's cancer treatment.

Plaintiff alleged in his Complaint that Dr. Kohut withdrew all medications and care as prescribed by a group of oncology caregivers from the community. (Doc. 2 at 6.)  The medical records, however indicate that on November 29, 2012, five days prior to Plaintiff's arrival at MSP, Dr. Thomas with the Cancer Center at St. Peter's Hospital stated that Plaintiff "needs 2 years of adjuvant androgen deprivation therapy, given his high-risk features with his high Gleason score and his PSA level."  (Doc. 32-4 at 2.)  Neither party discussed this issue.  Plaintiff

makes only general allegations that he was deprived of oncology treatments. This evidence however, indicates only a difference of opinion between two doctors. "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not [without more] amount to deliberate of indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds, Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). To establish that such a difference of opinion amounted to deliberate indifference, a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). The record clearly demonstrates that there was not a conscious disregard for Plaintiff's medical needs. As set forth above, there is no evidence that Plaintiff continues to suffer from cancer. Whether or not Dr. Kohut disagrees with other medical professionals is insufficient to establish deliberate indifference. Plaintiff has not shown that Dr. Kohut's course of treatment (monitoring Plaintiff's blood work) is medically unacceptable under the circumstances. This claim fails as a matter of law.

### B. Bladder issues

There are a number of issues raised in Plaintiff's filings regarding treatment

of his bladder conditions including: (1) treatment for bladder cancer and/or other related bladder issues; (2) denial of sanitary supplies; and (3) access to toilet facilities. Plaintiff has not presented sufficient evidence to demonstrate that Dr. Kohut was deliberately indifferent to any of these medical issues.

### 1. Treatment for Bladder Issues

Plaintiff claimed in his initial assessment that he had bladder cancer, but a January 9, 2012 bladder biopsy showed no malignancies. (Doc. 30 at ¶ 41.) There is evidence to suggest that he suffers from chronic inflammation in his bladder but there is no evidence to suggest that he has bladder cancer or that there is any treatment for his bladder issues. Even if there is some kind of treatment that is needed, Dr. Kohut cannot be held liable for a denial of that treatment given that Plaintiff refuses to let Dr. Kohut examine or treat him. There is insufficient evidence to suggest that Dr. Kohut has been deliberately indifferent in treating Plaintiff's bladder issues.

### 2. Sanitary Supplies

Second, Plaintiff alleged in his Complaint and the Supplement thereto that Dr. Kohut withdrew and withheld all sanitary supplies from Plaintiff. (Doc. 2, Doc. 10 at 2.) The records demonstrate that Plaintiff was provided with adult diapers upon his entry into MSP in December 2012. Numerous requests for adult

diapers were granted in December 2012 and January 2013. (Doc. 32-6 at 121, 124, 116, 113, 101, 100.) On February 21, 2012, however, Plaintiff requested a refill of adult diapers and was told, "You do not have a current HSR – and refused exam, therefore no Depends will be issued." (Doc. 32-6 at 92.) This denial was a couple weeks after Plaintiff sent a medical request asking that he not be treated by Dr. Kohut. (Doc. 32-6 at 98-99).

According to Defendants, the MSP Special Needs Committee reviewed and discussed Plaintiff's requests for sanitary supplies in six different meetings between December 11, 2012, and January 26, 2016. (Doc. 30 at ¶ 47.) In reviewing the records, it appears that Plaintiff's incontinence issues/sanitary supply issues were mentioned in four meetings. In their December 11, 2012 meeting, the Committee acknowledged that Plaintiff had an incontinent bladder and that he would require Depends. (Doc. 36 at 2.) On April 28, 2015, the Committee considered Plaintiff's request for adult diapers and a urinal. They acknowledged Plaintiff's report of incontinence and history of prostrate issues but noted that he had not allowed a provider to examine him. There is a note from this meeting that Plaintiff's Unit Case Manager reported that Plaintiff never complained about wetting himself and never requested additional clothing or bedding. (Doc. 36 at 11.) Plaintiff contends he handles his incontinence issues secretly. (Doc. 38 at ¶

48.)

In their September 15, 2015 meeting, the Committee considered Plaintiff's request for a urinal. They again acknowledged his history of prostrate cancer, benign bladder tumors, and urinary frequency with occasional incontinence. They noted that he had recently been started on Flomax and that a urinary consult was pre-authorized. The Committee denied the request for the urinal stating, "it is not clear how a urinal would help with occasional incontinence and frequence." (Doc. 36 at 16.) In their January 16, 2016 meeting, the Committee denied Plaintiff's request for a urinal for a trip to Butte because of the security risk but offered him Depends for the trip which he refused. (Doc. 36 at 21.)

Plaintiff also filed grievances regarding receiving sanitary items on February 26, 2013, and October 11, 2015. His October 11, 2015 informal grievance was ultimately denied on appeal to the Corrections Director on January 19, 2016. (Doc. 33-1 at 15-19.) Plaintiff also complained of incontinence in at least two medical visits on May 29, 2013, (Doc. 32-5 at 31) and April 22, 2015 (Doc. 32-5 at 24.)

After February 21, 2013, staff denied Plaintiff's requests for sanitary supplies and told him he needed to keep his medical appointments and allow medical staff to examine him to determine his medical need. (Doc. 30 at ¶ 45.)

There is undisputed medical evidence that Plaintiff suffered from "a history

of significant urinary frequency" (Doc. 32-1 at 72) and his bladder contained "marked chronic inflammation." (Doc. 32-1 at 49.) The Court acknowledges a potential security risk but this "security risk" did not seem to be a problem until Plaintiff refused to be seen by Dr. Kohut in February 2013. Thereafter, Plaintiff was denied sanitary supplies. The Special Needs Committee has admitted Plaintiff has urinary frequency with occasional incontinence. (Doc. 36 at 16.) It would seem only humane to provide Plaintiff with at least minimal sanitary supplies. However, again, Dr. Kohut is the only medical provider named as a defendant and the Court cannot find Dr. Kohut to be deliberately indifferent for discontinuing sanitary supplies when Plaintiff admits he refused to attend medical appointments with Dr. Kohut and refused to allow Dr. Kohut to examine him to determine his medical needs.

This issue seems to center around Plaintiff's admitted refusal to be treated by Dr. Kohut. While prisoners are guaranteed a certain level of medical treatment, they are not guaranteed their choice of physicians. *See Jackson v. Fair*, 846 F.2d 811, 817–18 (1st Cir. 1988); *Calloway v. Contra Costa County Jail Correctional Officers*, 2007 WL 134581, at *31 (N.D.Cal. Jan.16, 2007) (rejecting "the proposition that a prisoner has an Eighth Amendment right to receive treatment in the location or with the provider of his choice"); *Brownlow v. Chavez*, 871 F.Supp.

1061, 1064 (S.D.Ind. 1994) ("The Eighth Amendment does not guarantee a prisoner's choice of a physician, a mode of treatment or a place of treatment, nor does or could it guarantee a particular outcome or level of comfort in the face of physical maladies.") (internal citations omitted).

Plaintiff was given opportunities to have Dr. Kohut examine him to evaluate and treat his bladder issues. He refused that treatment. As such, the Court cannot say Dr. Kohut was deliberately indifferent to deny sanitary supplies.

### 3. Access to Toilet Facilities

Plaintiff also raises a claim about lack of access to a bathroom. In the Supplement to his Complaint he complained that Dr. Kohut and other officers would ignore his requests to use the facilities while he was in the infirmary. (Doc. 10 at 2.) Defendants presented evidence, however, that Plaintiff has access to bathrooms whether it be in his Unit, the infirmary, or in the dining areas. Plaintiff argues there have been situations where he did not have immediate access to a bathroom, but isolated incidents of not having immediate access to a bathroom is insufficient to state a federal constitutional claim. Courts in other districts have held that allegations similar to Plaintiff's involving a temporary delay in allowing a prisoner to use the bathroom, fall short of establishing an Eighth Amendment claim. *See, e.g., Samu v. Stewart*, 2011 WL 4074781, at *2 (W.D.Mich. Sept.13,

2011) (defendant's temporary refusal to allow the plaintiff, a 63–year old prisoner with a serious urinary medical condition, to use the bathroom was not a sufficiently serious deprivation under the Eighth Amendment); *Johnson v. McByrde*, 2010 WL 3059248 (W.D.Mich. Aug. 4, 2010) (defendant's refusal to allow plaintiff with a medical problem that caused him to urinate frequently to use the bathroom during a formal count, causing plaintiff to endure physical pain and to urinate on himself was insufficient to state a claim under the Eighth Amendment); *Tolbert v. Sutton*, No. 06 C 0297, 2007 WL 2219082, *1 (S.D. Ill. Jul. 27, 2007) (no liability where inmate taking medication that caused frequent urination was denied use of a bathroom and wet himself); *see also Hartsfield v. Vidor*, 199 F.3d 305, 309–10 (6th Cir. 1999) (allegations that prisoner was denied use of a toilet for two separate 8–hour periods over two days did not state a claim for violation of the Eighth Amendment); *Gerst v. Arpaio*, 2012 WL 3228838 at *4 (D.Ariz., Aug. 6, 2012) ("[a]s to Plaintiff's claim that he was deprived of air conditioning, water, and the use of a bathroom for three hours, he has alleged a temporary inconvenience, not a "sufficiently serious" deprivation"); *Saenz v. Reeves*, 2012 WL 4049975 at *14 (E.D.Cal., Sept.13, 2012) ("denying Plaintiff access to a toilet and water for five and one half hours on one occasion and four and one half hours on a separate occasion, while he was kept in a holding cell, are not sufficient to rise to the level

26

of a sufficiently serious deprivation to violate the Eighth Amendment").

Based upon this authority the Court finds that Plaintiff failed to present sufficient evidence of a sufficiently serious deprivation under the Eighth Amendment.

### C. Pain Medications

Plaintiff also alleged Dr. Kohut withheld pain medications prescribed to assist Plaintiff with pain caused by his cancer treatments.  (Doc. 2 at 6.)  Dr. Kohut explained that Plaintiff was given pain medication upon his arrival at MSP including Oxycodone and Oxycontin.  He was then weaned from this narcotic medication over a period of time.  (Doc. 30 at ¶¶ 80, 81.)  Dr. Kohut explained that this was done because Plaintiff had been treated for an overdose of methadone and showed a significant narcotic dependency problem.  (Doc. 32 at 4-6, ¶¶ 10-12.)  Plaintiff disputed this statement stating that he did not overdose rather he was suffering from sleep-deprivation and "novovirus" which was mistaken for an overdose.  (Doc. 38 at ¶ 78).

The medical records from St. Peters Hospital in Helena clearly state that Plaintiff presented on February 15, 2012 with "excessive opiates circulating in his system" and that he was having a methadone overdose at the hospital.  (Doc. 32-1 at 14-15.)  Given this evidence, Plaintiff has not presented a genuine issue of fact

that Dr. Kohut was deliberately indifferent to his serious medical needs when he attempted to wean Plaintiff off of pain medications.

Plaintiff denies there was a weaning period and argues that he was summarily removed from these medications and told to suffer. (Doc. 38 at ¶ 81.) But Plaintiff's medical records indicate that he was prescribed a short supply of both Oxycodone and Oxycontin on December 4, 2012. (Doc. 32-5 at 148.) He was given 10 mg of Oxycodone and 60 mg of Oxycontin for three days on December 9, 2012. On December 11, 2012 he was prescribed 40 mg of Oxycontin for three days. (Doc. 32-5 at 150.) On December 14, 2012, Plaintiff was prescribed 40 mg of Oxycontin for seven days and then 20 mg of Oxycontin for seven days and then 10 mg of Oxycontin for 30 days (12/30 - 1/29/13). (Doc. 32-5 at 149.) Although Plaintiff denies he received this medication (Doc. 38 at ¶ 84), he presented admissible evidence to support his denial. The Court finds the medical records and Dr. Kohut's affidavit to be sufficient evidence that Plaintiff was weaned from his pain medications.

There is no evidence that Dr. Kohut summarily removed Plaintiff from pain medications in December 2012 when he entered MSP. There is also no evidence that Dr. Kohut was deliberately indifferent when he weaned Plaintiff off his pain medications. Dr. Kohut should be granted summary judgment on this claim.

### D.  Mistreatment

Plaintiff also alleged Dr. Kohut insulted him, berated him, and mistreated him.  (Doc. 10 at 1.)  Dr. Kohut contends he never yelled at Plaintiff during an exam, indicated to Plaintiff that he knows better than the oncologists who treated his prostate cancer, or ignored or refused to review any of his medical records or conditions.  (Doc. 30 at ¶27.)  Plaintiff disputes this statement.  (Doc. 38 at ¶ 27.)

Even if Dr. Kohut insulted, berated, or verbally mistreated Plaintiff, such allegations are insufficient to establish a constitutional deprivation.  *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (holding that "[v]erbal harassment or abuse [of a prisoner]  . . .  is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983."); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (holding that prisoner's allegations of threats allegedly made by guards failed to state a cause of action).

### E.  Warden Kirkegard

Plaintiff alleges Warden Kirkegard knew of his condition and was the final arbiter of grievances (Doc. 10 at 4.)  Supervisory officials like Warden Kirkegard can only be held liable under section 1983 if they themselves personally violated a constitutional right.  *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009).  A supervisor may be liable:

if there exists either (1) his or her personal involvement in the
constitutional deprivation, or (2) a sufficient causal connection
between the supervisor's wrongful conduct and the constitutional
violation.

*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quotation and citation
omitted).

A supervisory officer's liability, however, can only be predicated upon a
violation of the plaintiff's federal right. It is axiomatic, therefore, that absent an
underlying violation of an individual's constitutional rights committed by
subordinate officers, supervisory personnel can have no liability for their own
personal involvement in the subordinate officers' conduct. *City of Los Angeles v.
Heller*, 475 U.S. 796, 799 (1986).

As set forth above, there is insufficient evidence to establish that Dr. Kohut
was deliberately indifferent to any of Plaintiff's serious medical needs. Having
found that there was no underlying violation of Plaintiff's constitutional rights
committed by Dr. Kohut, Warden Kirkegard can have no liability for his own
personal involvement in Dr. Kohut's conduct.

Summary judgment should be granted on this claim.

**V. CONCLUSION**

Even if the Court assumes that Plaintiff has serious medical conditions, there

is a lack of a genuine issue of material fact regarding whether Dr. Kohut was deliberately indifferent to those issues. Defendants are correct that Plaintiff failed to provide any specific, supported or material evidence to dispute the undisputed facts presented by Defendants. His responses are not sworn documents and he presents no other evidence to support his claims.

Plaintiff has not shown any admissible evidence of deliberate indifference sufficient to support a claim under the Eighth Amendment. Although Plaintiff may not have gotten the medical treatment he wanted to receive, Dr. Kohut evaluated his symptoms and provided a means of monitoring his conditions. Plaintiff's refusal to be examined or treated by Dr. Kohut is the death knell of his claims. At most, Plaintiff has shown a difference of opinion regarding the care he received which is insufficient to state an Eighth Amendment claim for deliberate indifference. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981.)

Because he has failed to establish deliberate indifference by Dr. Kohut, Plaintiff has also failed to state a claim against Warden Kirkegard.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1. Defendants' Motion for Summary Judgment (Doc. 29) should be **GRANTED.**

2.  The Clerk of Court should be directed to close this matter, enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure, and terminate all pending motions.

3.  The Clerk of Court shall have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 20th day of January 2017.

---

[4]As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after the period would otherwise expire.

_/s/ John Johnston_____

John Johnston
United States Magistrate Judge